## CHICAGO, INDIANAPOLIS AND LOUISVILLE RAILWAY COMPANY v. REED.

[No. 3,504.   Filed May 14, 1902.]

RAILROADS.—*Injury at Crossing.* — *Contributory Negligence.*—Plaintiff approached a railroad and highway crossing from the south, the highway ran north and south, and the railroad northwest and southeast; as she attempted to cross the tracks she was struck by a train going northwest; the evidence showed that when plaintiff was fifty feet from the crossing she could have seen southeast along the track more than 1,000 feet; the evidence and findings showed that when plaintiff was fifty feet from the crossing the locomotive was 1,000 feet to the southeast, and that when she was twenty feet from the crossing the locomotive was 400

feet to the southeast. *Held*, that plaintiff's failure to look and observe the approach of the train at a point where she could have avoided danger was negligence *per se*. *pp. 95–99.*

RAILROADS.—*Injury at Crossing.*—*Failure to Give Statutory Signals.*—*Contributory Negligence.*—The fact that a railroad company did not give the statutory signals as its locomotive approached a crossing did not relieve one about to cross the tracks from looking and listening for the approach of trains. *pp. 99, 100.*

From Carroll Circuit Court; *T. F. Palmer*, Judge.

Action by Martha M. Reed against the Chicago, Indianapolis & Louisville Railway Company for damages for injuries sustained at a railroad and highway crossing. From a judgment for plaintiff, defendant appeals. *Reversed.*

*E. C. Field, W. S. Kinnan, C. R. Pollard* and *R. C. Pollard*, for appellant.

*R. G. Million, G. F. Palmer* and *M. A. Ryan*, for appellee.

ROBINSON, P. J.—Suit for personal injuries. Appellee approached the crossing from the south, upon a highway running north and south, and crossing at an acute angle the railroad, which ran in a northwesterly and southeasterly direction, and was struck by a train going north. She attempted to cross the track in about the center of the highway. Loose gravel at the crossing extended south from five to ten feet from the west rail of the track. She was in a top buggy, drawn by a gentle horse, but which was afraid of the cars, which she knew. The buggy was without side curtains, but had the back curtain down. It was a still, clear day, about nine o'clock in the morning, in the month of August. Appellee was about sixty-two years old, had good eyesight and hearing, was familiar with the crossing, and had been for some time familiar with the highway and the location of the buildings and obstructions along the same. The train was a regular daily train, about on schedule time, running sixty miles an hour, and did not give the statutory signals as it approached the crossing. There were no noises near the crossing to hinder appellee hearing the noise of the train.

A hedge fence parallel with the highway and between it and the railroad extended north to within about 150 feet of the crossing. The north end of the hedge fence was about sixteen feet from the railroad track, and for ten or twelve feet back from the end it was four and a half to five feet high. The locality is in a practically level country, the bed of the railroad and the center of the highway both being a few inches above the general level of the ground. Going south from the crossing, the railroad track is straight for a distance of about 1,000 or 1,100 feet, and at this point there is a slight curve to the east, stated by the engineer to be a twenty minute curve. Appellee's line of vision was about seven feet above the level of the highway. The highway crosses the railroad track at an acute angle, so that a point in the center of the highway fifty feet south of the center of the crossing is fifteen feet west of the center of the railroad track. There was no obstruction between the end of the hedge fence and the railroad east of it that would obstruct the view southeast along the track for a distance of more than 1,000 feet if the person was in the center of the highway at a point as near to the railroad track as was the end of the hedge; so that if a person was at a point in the center of the highway fifty feet south of the center of the crossing, he could see southeast along the track more than 1,000 feet. The evidence and finding show that when appellee was fifty feet from the crossing the locomotive was 1,000 feet to the southeast, and that when she was twenty feet from the crossing the locomotive was 400 feet to the southeast. The alarm or danger whistle of the locomotive sounded continuously from a point about forty rods southeast up to the point of collision. We have taken the foregoing facts from the findings of the jury and from evidence which seems to be undisputed.

Appellee testified that as she approached the crossing she watched both ways, and listened for the train; that near the end of the hedge she slowed her horse into a walk, and at

that point she looked back down the track and did not see any train, and that she listened, and did not hear any train; that she had not heard the whistle of any train up to that time; that, after she slowed her horse into a walk, she went on, watching down the track both ways, "and when I got to the track, then I heard the screams of the train;" that the horse walked to the crossing; that when she heard the screams of the whistle "I was so near the track, I thought I was on the track,—that the horse was on the track. I looked for the train immediately, and saw the train. Of course I was very frightened, and the horse was the same. She was always afraid of the cars, and she started, and it is hard to tell just whether I tried to check her or what I did do, but I know that she went on in spite of me. She would go,—she would not have stopped if I had tried. Of course I tried to urge her then, thinking my safety laid in crossing the track. When I heard the scream of the whistle I couldn't stop to look right or left, I could only go where the horse took me." The engine struck the back wheel of the buggy as appellee passed over the crossing. Upon cross-examination appellee testified: Q. "Did the horse slack until he reached the loose gravel?" A. "That is my impression now." Q. "Isn't it a fact that he slacked when he reached that loose gravel at the crossing,—isn't that right?" A. "Yes sir." Q. "Up to that time he had gone along on a trot?" A. "He had. I did not strike the horse with the whip, that I can remember of, at all. I just drove on until I got clear upon the track until I heard the train; then I think the horse was frightened. I was dreadfully frightened, and the horse was frightened, and she gave a jump; and whether I tried to check her, I can't tell; only I know that I began to feel that my safest way was to cross the track."

The jury answered that the horse went continuously in a trot at the rate of five miles an hour up to the loose gravel

at the crossing, which extended from five to ten feet from the west rail of the track; also that the horse trotted a distance of 200 feet, up to within ten feet of the crossing, at the rate of four miles per hour; also that for fifty feet before entering upon the crossing the horse walked at the rate of three miles per hour. It is not controverted that the end of the hedge fence was sixteen feet from the track, nor is it controverted that a point in the center of the highway fifty feet south of the center of the crossing is fifteen feet from the center of the track. There is nothing in the record to show that there were any obstructions to prevent a view southeast along the track a distance of more than 1,000 feet by a person on the highway when he had reached a point as near directly west of the track as the end of the hedge fence was to the track. That is, when a person was in the center of the highway at a point fifty feet south of the center of the crossing, the record fails to show there were any obstructions to a view southeast along the track a distance of more than 1,000 feet.

If we take the answer of the jury most favorable to appellee,—that she was driving at the rate of three miles an hour,—she was going one-twentieth as fast as the train. And the jury find that when she was fifty feet, the train was one thousand feet from the crossing. At that time there was nothing to prevent appellee seeing the approaching train, had she looked. The law assumes that a person actually saw what he could have seen, had he looked, and heard what he could have heard, had he listened. The jury also find that when she was twenty feet from the crossing the locomotive was four hundred feet away. It commenced sounding the alarm whistle when 660 feet away, and continued until it reached the crossing. It was a still, clear day. She was acquainted with the crossing and its surroundings. The country was comparatively level. There were no noises to prevent the noise of the train being heard. Continuously from the time appellee was fifty feet from the crossing up to the cross-

ing, the train was where it could be seen, had she looked; and, from the time she was thirty feet away, the noise of the train and the alarm whistle could have been heard, had she listened. Why she did not or could not see or hear it is unexplained. Had she looked for the train at any time, from the time she came within fifty feet of the crossing up to the crossing, she must have seen it, and had she listened for it, she must have heard it, before she reached a place of danger. It is true, there is some evidence to show that when she first heard and saw the train she was in a place of danger, and that she believed her only safety lay in passing on over the crossing. But, if she saw the train before passing upon the crossing, and concluded she could pass over before the train reached her, she simply miscalculated her chances, and took the risk upon herself. However, it is unexplained why she did not see or hear the train before she reached a place of danger. She was approaching a place where it was her duty to assume that there was danger, and to act with care and prudence upon that assumption. As this record comes to us, we can not escape the conclusion that, had appellee looked, she could have seen the train, and that, had she listened, she could have heard the train in time to have avoided the injury. "If a traveler", said the court in *Smith* v. *Wabash R. Co.*, 141 Ind. 92, "by looking could have seen an approaching train in time to avoid injury, it will be presumed in case he is injured by collision, either that he did not look, or, if he did look, that he did not heed what he saw, such conduct is negligence *per se*." See *Cones* v. *Cincinnati, etc., R. Co.*, 114 Ind. 328; *Ohio, etc., R. Co.* v. *Hill,* 117 Ind. 56; *Mann* v. *Belt R., etc., Co.*, 128 Ind. 138, and cases cited; *Thornton* v. *Cleveland, etc., R. Co.*, 131 Ind. 492, and cases cited.

It is true the locomotive did not give the statutory signal as it approached the crossing; yet, this did not excuse appellee from using her senses of sight and hearing in order to

ascertain the fact .for herself.  *Mann* v. *Belt R., etc., Co., supra; Thornton* v. *Cleveland, etc., R. Co., supra.*

· Judgment reversed, with instructions to sustain appellant's motion for judgment.                                        ●